United States v. Cluck. Morning. Morning. May it please the court. My name is Barclay Johnson. I'm an attorney with the Defender's Office in Vermont, and I'm pleased to be here on behalf of Mr. Clark. When the offense was committed here and when he was sentenced, a retroactive sentence reduction was possible under the version of 1B1.10 in effect at the time because that version allowed a reduction, a district court to grant a reduction comparably less than the amended guideline range. It's the elimination of this sentence reduction mechanism, or the limitation of it, that we argue is an ex post facto clause violation. We think this claim is in keeping with the relevant Supreme Court precedent that says eliminating or reducing access to such an early release mechanism can be such a violation. In Mathis, the Supreme Court said removal of such provisions can constitute an increase in punishment because a prisoner's eligibility for reduced imprisonment is a significant factor entering into the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed. That eligibility exists at the outset, when the plea is entered or when the sentence is imposed. I think exactly, and here— What we're looking at here is, however you wish to characterize it, is a mechanism that deals with the reduction of the sentence. And I'm not sure I know how the ex post facto clause governs reductions in sentences. Because your client's already been sentenced. Right. There he is. And like the Supreme Court cases dealing with the parole or early release, he was sentenced in 2010. He was eligible at that time for potentially subsequent sentence reduction, retroactive sentence reductions. That eligibility was changed when the amendments to 1B.1.10 went into effect. But that retroactive sentence reduction had not taken place yet. He was eligible through a review process that might, in the event that there was a retroactive amendment made subsequently, he could take advantage of that review process. But there was not a sentence reduction in place at the time of the sentence. Right, but had there been under the version of 1.10 in effect then, he would have been eligible for it. And it's the narrowing, constricting elimination of that eligibility that we think is analogous to what the Supreme Court has dealt with. Weaver, for example, the Supreme Court held there's an ex post facto clause violation because the new provision constricts the inmate's opportunity to earn early release. And that makes more onerous the punishment for crimes committed before its enactment. This court in Berrios, Underwood, and Sash vs. Zank recognizes that the elimination of the chance for a lower sentence can violate the ex post facto clause, even if the new statutory regime doesn't produce a longer sentence. Courts ruling to the contrary, and we understand there are quite a few, they err when they focus only on whether the length of the sentence is literally, numerically increased by the new law. We don't think that's ever been the requirement. Garner, for example, asks whether the law creates a significant risk of prolonging respondents' incarceration. That is, whether the sentence is likely to be longer under the new law or the old law. And we think there's a difference between looking only at whether a defendant's sentence numerically increases because of the new law and looking at what was the likely sentence under the old law and what is the sentence under the new law. This is what Mathis, Weaver, Berrios, all say they do. Under the old law, our position is there's a very high chance, a very high likelihood of a lower sentence for Mr. Clark. Under the new law, he's no longer even eligible for a reduction. Morales and Garner and even Pugh get into a probabilistic analysis. And we know that for the most recent reduction, there were some 28,000 reductions handed out. In some 13,000 denials, the average reduction was 25 months. We think this suggests that absent new restrictions, there's a very high likelihood that someone like Mr. Clark would receive a lower sentence. Is that so in this particular case? I believe so. Why is that? Because, and correct me if I'm misunderstanding the record, but the amendment to the guidelines reduced Clark's guidelines range from 210 to 262 months to 168 to 210 months. But his original sentence was 144 months below the applicable guidelines range, still below the applicable guidelines range. Right, and what we point to is the, I mean there's a number of changes that went into effect in 1B.1.10. And the change that limits his access to it is the change that says a new sentence, an amended sentence, must be within the amended guideline range. Prior to that amendment, when he committed the crime, when he was sentenced, the court could have granted a reduction comparably below the sentence, the amended guideline range. And so, just as he received a 144 month sentence based on his office, you know, 210 to 268 guideline, month guideline range, he could have received a sentence comparably below the amended guideline range subject to the mandatory minimum. Thank you. You've reserved a couple minutes for rebuttal and we'll hear you next. Good morning. Good morning, your honor. May it please the court. The vitality of the appellant's argument in this case rests completely on the continued vitality of the substantial disadvantagement or loss opportunity test. The problem, the inconvenient fact for the appellant is that that test was disavowed in Morales by the Supreme Court in 1995. And the abandonment of that test was affirmed in Peugh in 2013 by the Supreme Court. While the court did, in a footnote, it said the results of those cases, the Weaver and Miller that addressed this test, the results in that case that found an ex post facto problem, that stands. But the reasoning was jettisoned in favor of the test that was formulated by Justice Sotomayor in Peugh, which is, does the change in the law offer a sufficient risk for an increase in penalty? It's the increase in penalty that is what triggers the ex post facto problem. And in this case, we are dealing purely with a reduction in sentence. It is completely distinguishable from a case where there is a built-in mechanism, as in Weaver, the cases that did deal with the loss opportunity. Those cases dealt with circumstances where at the time of, certainly at the time of sentencing, there was a protocol in place that provided for a reduction in the sentence. That is what was in the appellant's mind in those cases as a factor in determining to plead guilty, because he knew when he did it, if he got ten years, then if he did certain things, time would be whittled off. In this case, though, as the court has already noted, when Mr. Clark was sentenced, he received a 144-month sentence, and that's the end of it. Any discussion about what was going to happen with the sentencing guidelines, whether there would be a retroactive, whether there would be a reduction in the first place is always a big question. And then whether or not that reduction would be made retroactive, that was all pure speculation. And that speculation was addressed in Pew and specifically rejected as a basis for finding an ex post facto violation. I want to address one other point, is that in the Berrios case, this court did address whether there was an ex post facto violation, and the court did not find a violation. The court found that there wasn't one because the amendment that triggered the court's rejection   did not result in a more onerous sentence. Again, ex post facto, according to the third factor in Calder v. Bull, says that when there is an increase in penalty, that is what triggers ex post facto review. In this case, we are dealing purely with the reduction, and therefore the court should not find any ex post facto violation and join the many other circuits that have already addressed this issue. I think your adversary distinguishes Berrios on the ground that this amendment didn't limit the reduction, it absolutely foreclosed it. And that in Berrios, there was sort of a limitation. Here, there just can't be any consideration of whether to impose a lesser sentence. Right, there is a narrowing of the class. It did foreclose, in certain instances, people who could take advantage of the reduction, but it is, once again, we go back to the foundation of they're seeking a reduction. There's no increase in the penalty. His sentence is going to remain the same no matter what happens. He was only looking and hoping to take advantage of a reduction. A further reduction, given that he already got a huge one from the district court at the outset, which is why he wasn't eligible in the first place, because he already got a huge windfall at the outset in the negotiation and imposition of sentence then. So he doesn't join that class that could take advantage of that, but we are dealing with a reduction in his sentence that has already happened. There's no increase to his sentence. Therefore, the ex post facto clause is not applicable. Thank you. Thank you, Your Honor. As I noted at the outset, the Supreme Court has said that when a mechanism like this is reduced or eliminated, that can be an increase in punishment for purposes of the ex post facto clause. The substantial disadvantage test, we think that's largely a matter of semantics. Our claim doesn't turn on whether the court uses the term disadvantage or burdensomeness or onerousness or quantum of punishment. Cases like Garner ask whether the law creates a significant risk of prolonging the respondent's incarceration. That is whether the sentence is likely to be longer under the old law or the new law. Morales says the question is whether the law creates a significant risk of increasing the measure of punishment. Here, the new version of 1B.1.10 creates a significant risk that the sentence will be longer relative to the old law. That is, he very likely would have received a reduction under the old version of 1B.1.10.  Nor is there any question that the measure of punishment was already sentenced substantially below the guidelines. Presumably, once the judge was diving below the guidelines range, the judge could have gone down as far as the judge thought appropriate, provided he could explain it. So, your assumption that the judge would have repented of this sentence, given the freedom to lower the sentence even further, doesn't really ring true, does it? I think it does. One thing I want to mention is there's an agreement, although the government argues the contrary on appeal, there was agreement below that the 11C.1.C agreement doesn't preclude a reduction here. I think the court in Pugh, Morales, Garner, all are making a probabilistic analysis. Here, we know that there were 28,000 reductions granted, 13,000 denials. There's a very high likelihood that someone like Mr. Clark would have received a reduction were he eligible. Thank you. Thank you both. We'll reserve decision.